**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3716-14T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

J.D., JR.,

    Defendant-Appellant,

and

J.G.,

    Defendant.

_____

IN THE MATTER OF J.D., III,
a minor.

_____

> **APPROVED FOR PUBLICATION**
>
> **October 4, 2016**
>
> **APPELLATE DIVISION**

Submitted September 14, 2016 — Decided October 4, 2016

Before Judges Fuentes, Carroll, and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FN-06-153-14.

Joseph E. Krakora, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ashton

L. DiDonato, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Annemarie Sedore, Designated Counsel, on the brief).

The opinion of the court was delivered by

CARROLL, J.A.D.

Defendant J.D., Jr. (John)[1] appeals from the Family Part's October 1, 2014 fact-finding order, finding that he abused or neglected his ten-year-old son, J.D., III (Jason). The court terminated the litigation in February 2015, with defendant ultimately retaining physical custody of Jason.[2]

The fact-finding order was entered after what can best be described as a "trial on the papers." That is, the parties agreed to forego the presentation of witnesses, and to have the court decide the case based on various redacted documents offered into evidence by the Division, and oral argument. Defendant did not object to the Division's evidence or offer any proofs at the hearing. Jill presented defendant's drug and alcohol evaluation

---

[1] We use pseudonyms for the reader's convenience and to protect the privacy of the child. R. 1:38-3(d)(12).

[2] The February 23, 2015 order also continued joint legal custody of Jason with defendant and Jason's biological mother, J.G. (Jill). Jill was named as a defendant in the action solely for dispositional purposes. Plaintiff Division of Child Protection and Permanency (Division) did not seek a finding of abuse and neglect as to Jill, nor is she a party to this appeal.

report for the limited purpose of impeaching statements defendant made during the Division's investigation of the incident in which he denied consuming any alcohol.

In brief, the Division alleged that defendant drove to a bar, late on a school night, and left Jason unsupervised in the car while defendant patronized the bar. The police were called, and upon responding they observed that defendant was visibly intoxicated. Defendant attempted to flee the police, at a time when he still believed his son was left unattended in the car outside the bar. The Law Guardian supported the Division's complaint, seeking a finding of abuse or neglect.

On appeal, defendant challenges the abuse or neglect finding on three grounds: (1) there was insufficient competent, reliable evidence establishing harm or risk of harm to Jason, because the Division presented only documentary evidence; (2) expert testimony was required to establish defendant's intoxication or impairment; and (3) defendant's later admission to substance use at a substance abuse evaluation and engagement in treatment did not prove abuse or neglect. For the reasons that follow, we find these arguments unpersuasive, and affirm the finding of abuse or neglect.

I.

Before addressing defendant's arguments, we must define the record. At the fact-finding hearing, the Division offered into

evidence, with the consent of defendant's attorney, the following documents: (1) the Division's investigation summary dated May 9, 2014; (2) the Division's investigation summary dated April 21, 2014; and (3) Millville Police Department investigation reports. The documents contained several redactions that were agreed upon by counsel for defendant and the Division. Jill introduced defendant's substance abuse assessment, dated June 3, 2014, solely for impeachment purposes. The pertinent evidence in those documents is as follows.

By way of background, the Division has been involved with the parties since October 4, 2007. Between October 2007 and May 2014, the Division received twelve referrals, most of which related to Jill's history of substance abuse. The initial referrals received in 2007 were substantiated for Jill's possession and use of heroin and she was deemed unfit to have custody of Jason.

Pertinent to this appeal, on April 21, 2014, the Division received a referral alleging that defendant was abusing alcohol and driving intoxicated with Jason present. At the time, defendant had legal and physical custody of Jason pursuant to an August 12, 2013 order, which also terminated Jill's parenting time. Jill reported that she received a phone call from Jason's babysitter, K.H. (Kim), advising that defendant was intoxicated when he arrived to pick up Jason. According to Jill, defendant had a history of

drinking daily to the point of intoxication, drunk driving, and drug use. Jill reported that defendant planned to bring Jason to her house because he had to go to work, although both were aware that such action violated the existing court order prohibiting Jill from having unsupervised contact with Jason.

The next morning, Jill filed a motion for an emergent hearing seeking temporary custody, which was denied. Jill told the Division caseworker that defendant "needs help" and that he was intoxicated when he dropped Jason off at her home the previous day. Jill stated that defendant was "lost for hours . . . and did not know how to get to her house" although he had been to her home several times. She further explained that defendant had called her in the evening stating that he went out drinking and "he was slurring on the phone."

In response to the referral, a caseworker called defendant to determine why he left Jason with Jill despite the court order terminating her parenting time. Defendant explained that he "panicked" and that he could not leave Jason with the babysitter because of an incident that occurred with the babysitter's neighbor. Defendant claimed he made many phone calls to find another babysitter while he went to work, and that Jill was his last option.

Defendant acknowledged that leaving Jason with Jill was a "mistake" and that he only did so on this occasion "out of pure desperation." Nevertheless, defendant also explained that Jill had been "doing well" and he thought he could "trust her."

As part of its investigation, a Division caseworker inspected defendant's home and conducted separate interviews with defendant and Jason. Defendant told the Division caseworker that he was a recovering alcoholic and addict, having used "everything but heroin," although he denied being under the influence at the time of the referral. However, defendant declined to submit to a urine screen or complete any services through the Division. When questioned, Jason "denied that he has ever seen alcohol in his home and denied that he has ever seen his father drinking alcohol."

The Division concluded that the allegation of abuse or neglect was not established by a preponderance of the evidence, but that Jason was "harmed or placed at risk of harm." The Division recommended the case remain open to provide substance abuse services to Jill. The Division also sought a litigation conference due to defendant's refusal to complete a drug screening. Notwithstanding, the investigation revealed that Jason denied allegations defendant was intoxicated at the time; the Millville Police Department had no reports regarding defendant; and

defendant did not appear to be under the influence of any substance when interviewed by the Division.

The Division was in the process of completing its investigation when it received a second referral regarding defendant on May 9, 2014, which precipitated the filing of the Division's complaint. On that date, the Millville Police Department advised the Division that defendant had been arrested at Sidelines Bar (Sidelines) the night before. According to the police reports, Officers Joseph Dixon and Vern Babka responded to Sidelines at approximately 10:08 p.m. on May 8, "in reference to an intoxicated male who[] was inside the bar and left his juvenile child outside in his vehicle for an extended period of time."

Based on their training and experience, Dixon and Babka observed "a strong odor of an alcoholic beverage emitting from [defendant's] person" and defendant was "having a difficult time maintaining his balance" while speaking with the officers outside in the parking lot. Babka summoned the Millville Rescue Squad to evaluate defendant due to his apparent high level of intoxication.

While waiting for the rescue squad to arrive, the officers questioned defendant about leaving his son outside the bar. Defendant stated that he "only ran inside." However, an off-duty New Jersey State Trooper who was at Sidelines informed Dixon that "according to the surveillance tapes, [defendant's] vehicle was

parked on the side lot of Sidelines for approximately [twenty] to [thirty] minutes."

As described in the police report, defendant made several attempts to walk away from the police before sprinting away from them. Defendant was apprehended and charged with endangering the welfare of a child, N.J.S.A. 2C:24-4a; resisting arrest by flight, N.J.S.A. 2C:29-2(a); and obstruction, N.J.S.A. 2C:29-1(a). The record does not disclose the status of these criminal charges.

Dixon reported that he was "forced to deliver several closed fist strikes to [defendant] in order to gain compliance." Consequently, defendant sustained several lacerations to his head and upper lip and was taken to Inspira Medical Center (Inspira) for treatment. Dixon noted in his report that while at the hospital, defendant repeatedly refused an examination of his blood alcohol content by Inspira staff, and despite the passage of two to three hours, he was "eventually sedated for being uncooperative."

Jason was taken into the care and custody of his paternal aunt, B.D. (Barbara), and the matter was referred to the Division for further investigation. The following day, Division caseworkers interviewed defendant at his home in Millville. Defendant claimed that Sidelines was a bar that also sold liquor to go, and that he was "on his way to a friend's home with [Jason]

and stopped at Sidelines to purchase a bottle for her." Defendant noted that "kids are not allowed in bars," and further stated that he was in Sidelines for approximately five minutes when police approached him as he was exiting. According to defendant, the police refused to let him speak with Jason, and he claimed they "slammed [him] on the ground, [and] they said that [he] was resisting arrest."

Defendant further denied that he had been drinking prior to going to Sidelines, and he became visibly annoyed while stating to the caseworkers that he was a recovering addict and alcoholic and had not consumed alcohol for the past two years. However, he again refused the Division's request that he undergo a urine screen.

Division caseworkers then interviewed Jason privately at his Aunt Barbara's home. Jason denied seeing his father drink alcohol before going to Sidelines, and further denied that his father was "acting strangely, slurring words, or having difficulty standing and/or walking." Jason reported that he was left in his father's car for approximately "five minutes" before the owner of the bar came outside and brought him into Sidelines through the back entrance and requested that he identify his father. Jason stated that he remained in the back room for approximately ten minutes while the bar owner spoke to defendant. When asked whether he saw

his father drinking at the bar, Jason replied, "I don't know." Jason denied witnessing his father's arrest, but stated he could see him speaking with police upon their arrival and later inside the police car.

Defendant subsequently agreed to undergo a substance abuse assessment, during which he admitted consuming alcohol on May 8, 2014. As noted, the assessment report was introduced by Jill to impeach defendant's previous statements to the Division's caseworkers denying any alcohol consumption.

Following summations by counsel and a recess to review the documentary evidence, the court rendered an oral opinion finding that defendant abused or neglected Jason pursuant to N.J.S.A. 9:6-8.21(c). Initially, the court noted that, "as [it] has only had the opportunity to review exhibits, it's very difficult to assess anybody's credibility as to items referenced in the report[s], which were admitted without objection." The court found defendant "was under the influence of alcohol at the time in question," although in the absence of a blood alcohol reading or balance tests the court was "[un]able to make any particularized finding as to the level of his intoxication."

After reviewing relevant case law, the court reasoned that "[a] risk of harm is a sufficient basis for the [c]ourt to make a finding of abuse or neglect." The court concluded that defendant's

actions placed Jason at substantial risk of harm. In addition to finding that defendant was under the influence, the court found "that [he] was trying to flee the scene, while the child was still present" and "that the child had been left alone in the car for a period of time, at least five minutes."

As to dispositional matters, the court permitted defendant to have unsupervised visitation with Jason twice per week, and for overnight visits to be instituted at the Division's discretion. Subsequently, at a case management conference held on November 10, 2014, the court granted defendant overnight visits, noting that any objections raised by Jill resulted from the parties' ongoing dispute regarding custody. Compliance review hearings were thereafter held on December 2, 2014, and February 23, 2015. On February 23, the court granted the Division's request to terminate the litigation, and continued joint legal custody of Jason with defendant and Jill, with defendant designated as the parent of primary residence. Defendant's appeal of the October 1, 2015 fact-finding order followed.

## II.

We first address defendant's argument that the trial court erred in admitting the Division's investigation summaries and the police reports. Specifically, defendant contends that: (1) the trial court failed to conduct the necessary N.J.R.E. 104(a) hearing

requiring the Division to produce a qualified witness to authenticate the records; and (2) the police report contained inadmissible embedded hearsay from an off-duty state trooper, which the Law Guardian relied on in arguing the length of time that Jason was left unattended in the car before being taken inside by the bar owner.

We begin by recognizing that the documents admitted into evidence contained embedded hearsay subject to objection, notwithstanding the admissibility of Division records. N.J.S.A. 9:6-8.46(a)(3) allows admission into evidence of Division records "of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding . . . [as] proof of that condition, act, transaction, occurrence or event" if it meets the prerequisites for admission of a business record. In other words, the judge must find "it was made in the regular course of the business . . . and it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter." Ibid. See also R. 5:12-4(d) (stating that documents prepared by Division staff are admissible if they satisfy the requirements of the business records exception to the hearsay rule, N.J.R.E. 803(c)(6) and 801(d)).

However, hearsay embedded in such records must satisfy a separate hearsay exception.  See N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 466-67 (App. Div. 2014) (noting that notwithstanding admissibility of Division records that meet the business records exception, hearsay embedded therein must meet other hearsay exceptions in order to be admitted).  See also Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 173-74 (App. Div. 2012) (stating that trial court should have excluded expert opinion, although contained in otherwise admissible business records, absent specific findings regarding trustworthiness).

Defendant's own statements are admissible as statements of a party-opponent.  N.J.R.E. 803(b)(1).  Jason's out-of-court statements are admissible as those of a child victim, subject to the statute's corroboration proviso, N.J.S.A. 9:6-8.46(a)(4).  By contrast, the statements of another person, such as a police officer recounting statements made by an unidentified off-duty state trooper, must satisfy a separate exception.

Here, however, defendant through his counsel agreed to admission into evidence of the documents, as redacted, and a trial on the papers.  Notably, in response to Jill's counsel's initial objection,[3] defendant's counsel specifically stated,

---

[3] This objection was subsequently withdrawn.

> Your Honor, his client is dispositional . . . This is strictly a finding that the Division [is] trying to make against my client. So, if I'm not asking for any testimony, then I would like to proceed on the documents. If [Jill's counsel] doesn't want them admitted against his client, that's fine; but, I accept them as is against my client.

The record before us is clear that the Division relied on defendant's attorney's consent to the admission into evidence of the documents. Had defendant taken a contrary position, the Division was fully prepared to call the Division caseworker and the police officers as witnesses. Consequently, we conclude that defendant's belated challenge to the admission of the documents, including the trial court's failure to conduct a N.J.R.E. 104(a) hearing, is barred by the invited error doctrine. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340-41 (2010) (applying invited error doctrine and holding that defendant's failure to object "deprived the Division of the opportunity to overcome any objection and deprived the trial court of the necessity to make a ruling").

Even if the invited error doctrine did not dispose of defendant's argument, we apply the principle that hearsay subject to a well-founded objection is generally evidential if no objection is made. State v. Ingenito, 87 N.J. 204, 224 n.1 (1981) (Schreiber, J., concurring). As we have recently recognized:

> [A] party is free to waive objection to the admission of hearsay evidence. In some cases, parties may have no reason to question the accuracy of such hearsay, or may make "a strategic decision to try the case based on the documents, instead of possibly facing a witness's direct testimony."
>
> [N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 503 (App. Div. 2016) (citing M.C. III, supra, 201 N.J. at 342).]

In general, it is not the judge's responsibility, particularly in a bench trial with represented parties, to intervene with a well-founded hearsay objection, whenever counsel choose not to raise one of their own.[4] When objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence. See In re Civil Commitment of A.X.D., 370 N.J. Super. 198, 202-03 (App. Div. 2004) (stating that "possible prejudicial impact of complex diagnoses included in medical records [despite N.J.R.E. 808] was of less concern" in bench trial); In re Civil Commitment of J.M.H., 367 N.J. Super. 599, 613 (App. Div. 2003) (stating that risk of fact-finder's misuse of hearsay utilized by testifying expert

---

[4] On the other hand, it is certainly within a trial judge's discretion to interpose such objections, or alert counsel that objectionable hearsay shall not be considered.

"does not pose as serious a concern" in bench trial), certif. denied, 179 N.J. 312 (2004).

As the trial court may give such evidential weight to objectionable hearsay that is appropriate under the circumstances, an appellant faces an especially high hurdle in an appeal from a civil bench trial to establish that the admission of such evidence constitutes "plain error" — that is, that the admission of such evidence was "clearly capable of producing an unjust result." R. 2:10-2. See McCormick on Evidence, § 52 at 368 (suggesting that the consideration of "relevant, trustworthy evidence" is not likely to be deemed plain error, because it is not "likely to cause justice to miscarry," absent violation of an exclusionary rule of evidence designed "to promote an extrinsic social policy").[5]

Applying these principles, we are not persuaded that the court committed plain error by considering the embedded hearsay in documents admitted into evidence, and, in particular, the information attributed by Officer Dixon to an unnamed off-duty

_____

[5] Our conclusion that various embedded hearsay statements were evidential is not at odds with N.J.S.A. 9:6-8.46(b)(2), which states that "only competent, material and relevant evidence may be admitted" in a fact-finding hearing. Hearsay does not relate to proof's relevance, see N.J.R.E. 401, or competence, see N.J.R.E. 601. Indeed, based on the doctrine of invited error, inadmissible hearsay was deemed acceptable evidence in M.C. III, supra, 201 N.J. at 342.

state trooper who purportedly reviewed the bar's surveillance tapes and ascertained that defendant's car was parked outside for approximately twenty to thirty minutes. In any event, the trial court appears to have largely discounted this information, finding only that Jason had been left in the car for a period of at least five minutes, which coincided more closely with the timeline attributed to defendant and Jason in the Division's investigation summary.

## III.

We next consider defendant's argument that the court's finding lacks the support of sufficient, reliable evidence. We accord deference to the Family Court's fact-finding in part because of the court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). However, that deference is perhaps tempered when the trial court did not hear testimony, or make credibility determinations based on the demeanor of witnesses. Cf. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009) ("[W]hen no hearing takes place, no evidence is admitted, and no findings of fact are made, . . . appellate courts need not afford deference to the conclusions of the trial court."). We shall uphold the court's fact finding if supported by sufficient, substantial and credible evidence in the record. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261,

279 (2007). However, we will not hesitate to set aside a ruling that is "wide of the mark." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011).

An "abused or neglected child" means, in pertinent part, a child under the age of eighteen

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof[.]
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Interpreting N.J.S.A. 9:6-8.21(c)(4)(b), our Supreme Court held that mere negligence does not trigger the statute. Dep't of Children & Families v. T.B., 207 N.J. 294, 306-07 (2011); G.S. v. Dep't of Human Servs., 157 N.J. 161, 177-78 (1999). Rather, the failure to exercise a minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." T.B., supra, 207 N.J. at 305 (quoting G.S., supra, 157 N.J. at 178).

Although the distinction between willful or wanton negligence and ordinary negligence cannot be precisely defined, McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970), the essence of willful or wanton negligence is that it "implies that a person has

acted with reckless disregard for the safety of others." G.S., supra, 157 N.J. at 179 (citations omitted). Further, willful or wanton conduct is that which is "done with the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (citations omitted). However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant," and "[k]nowledge will be imputed to the actor." Ibid. (citation omitted).

A determination of whether a parent's or guardian's conduct "is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one." T.B., supra, 207 N.J. at 309. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., supra, 157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention

or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citation omitted).

In the present case, it is undisputed that defendant drove with ten-year-old Jason to Sidelines at 10 p.m. on a school night and intentionally left the child unattended in the car while defendant went inside and seated himself at the bar. It is further undisputed that the child remained outside for a sufficient period to attract the attention of the bar owner, who removed Jason from the car, brought him inside, had him identify his father, and alerted the police. Also undisputed are defendant's lack of knowledge that Jason had been taken from the car; that defendant attempted to flee the police and leave Jason behind; that defendant's level of intoxication was so high as to warrant the summoning of the local rescue squad; and that defendant refused blood tests at the hospital and urine screens requested by the Division.

Defendant argues that this evidence is insufficient to support the finding that his actions placed Jason at substantial risk of harm. We disagree. While thankfully the bar owner who approached Jason and removed him from the car acted with the highest of motives, the result may have been tragically different had another stranger confronted Jason outside the bar. Also, given defendant's level of intoxication, it is reasonable, and far

from imaginary, to envision the harm that may well have befallen Jason and others had defendant driven his vehicle upon leaving the bar. In sum, we are satisfied there is sufficient evidence in the record to support the trial court's finding that defendant abused or neglected Jason by creating a substantial risk of injury to him by leaving him unattended in a vehicle in the late evening while defendant entered a bar, became intoxicated, and attempted to flee the police.

We nonetheless take this occasion to caution trial judges about the dangers inherent in adjudicating contested trials "on the papers," and the corresponding need to make specific factual findings of abuse or neglect. See R.W., supra, 438 N.J. Super. at 468 (cautioning trial judges "in contested cases who render fact-findings based solely on documentary submissions, particularly in the affected parent's absence"). See also N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 265 (App. Div. 2002) (cautioning that judicial findings must be based on competent reliable evidence and that judges must articulate, with particularity, the facts upon which a determination of abuse or neglect is made).

In the present case, we are able to glean sufficient undisputed facts from the record that adequately support the judge's finding of risk of harm to Jason. However, contested

21 A-3716-14T4

cases often turn on credibility determinations, which by their nature are impeded when the trial court cannot make first-hand observations of the witnesses. Additionally, the absence of live testimony obstructs the trial court's ability to obtain additional details that may be necessary to augment or clarify information contained in the documentary evidence, potentially impairing the judge's ability to make more detailed factual findings. In short, the procedure employed here, that is, submitting redacted documents in lieu of testimonial evidence, fails to allow the judge to resolve disputed issues or make credibility determinations. "Our overarching consideration in all matters concerning children involved in the judicial system is 'the best interests of the child.' This principle is embedded in the doctrine of parens patriae, which authorizes the court to intervene when necessary to prevent harm to the child." Segal v. Lynch, 413 N.J. Super. 171, 178 (App. Div.), certif. denied, 203 N.J. 96 (2010). Fawzy v. Fawzy, 199 N.J. 456, 474-75 (2009). Thus, even when the parties acquiesce to a trial "on the papers," we reiterate that fact-finding hearings must still adhere to fundamental rules of evidence and must be conducted with the formality and decorum we expect from any other adjudicative proceeding. J.Y., supra, 352 N.J. Super. at 264-65. Family Part judges are not bound by

the parties' wishes to adjudicate fact-finding hearings through the expedited approach reflected here.

IV.

We have considered defendant's remaining arguments and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Contrary to defendant's argument, expert testimony is not required to establish that an individual is intoxicated due to alcohol. See State v. Smith, 58 N.J. 202, 213 (determining that "[a]n ordinary citizen is qualified to advance an opinion in a court proceeding that a person was intoxicated because of consumption of alcohol"). We are also satisfied that defendant's substance abuse evaluation, during which he admitted consuming alcohol on the date of the incident, was properly admitted solely to impeach his earlier statements in which he denied any alcohol use during the prior two years. In any event, this admission played scant if any role in the court's ultimate finding of abuse and neglect.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION